**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

TRACI S.,[1]
     *Plaintiff*,

   v.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL SECURITY,
     *Defendant.*

No. 3:21-cv-01582(VAB)

**RULING AND ORDER ON MOTIONS REGARDING THE COMISSIONER'S DECISION**

Traci S. ("Plaintiff") has filed this administrative appeal under 42 U.S.C. § 405(g) against Kilolo Kijakazi, the Acting Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title II disability insurance benefits under the Social Security Act. Compl., ECF No. 1 (Nov. 29, 2021) ("Compl.").

Traci S. has moved for an order reversing the decision of the Commissioner, or, in the alternative, an order remanding the case. *See* Mot. for Order Reversing the Commissioner's Decision, ECF No. 14 (Mar. 29, 2022) ("Pl. Mem.").

On May 25, 2022, the Commissioner moved to affirm the decision. *See* Def. Mot. for an Order Affirming the Decision of the Commissioner, ECF No. 16 (May 25, 2022); Def.'s Mem. in Supp. of Mot. for an Order Affirming the Commissioner's Decision, ECF No. 16-1 (May 25, 2022) ("Gov't Mem.").

---

[1] For purposes of this Ruling and Order, the Plaintiff will be identified only by her first name and last initial.

For the following reasons, Traci S.'s motion is **DENIED**, and the Commissioner's motion is **GRANTED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Born in 1971, Traci S. reached the age of forty-one at the time of the alleged onset of her disability. *See* Tr. of Administrative Proceedings at 214, ECF No. 10 (Jan. 27, 2022) ("Tr."). Before the alleged onset of her disability, Traci S. worked as a receptionist at a veterinary hospital for seven years and as a window clerk at a post office for approximately seven years. *See* Tr. at 250. Traci S. has not engaged in substantial gainful activity since her alleged onset date. *See id.* at 20–32.

The Administrative Law Judge J.K. Harrington ("ALJ Harrington") found Traci S. to have the following severe impairments: "Pelvic Prolapse Syndrome and Cystocele/Rectocele." Tr. at 29. The ALJ concluded that Traci S.'s Bell Palsy, Grave's Disease, Glaucoma, Psoriasis, and Anxiety Disorder impairments are "non-severe" because "such impairments establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to meet the basic demands of work activity." *Id.* at 23.

#### 1.  Medical History

On March 1, 2011, Dr. George Heading ("Dr. Heading") completed a medical source statement. He wrote that Traci S. has a limitation of lifting up to ten pounds and can do so two hours out of the day. *Id*. at 2049. She can reach above her shoulders four hours a day, walk two hours a day, stand two hours a day, and sit six hours a day. *Id*. She can perform stooping and bending two hours day. *Id*.

On April 28, 2011, Traci S. underwent pelvic surgery in the form of robotic-assisted laparoscopic myomectomy, trans obturator tape, cystoscopy, and posterior repair with mesh, for diagnoses of symptomatic uterine fibroids, pelvic organ prolapse, and stress urinary incontinence. *Id*. at 2438.

On September 19, 2011, Dr. James Brunetti wrote a letter on Traci S.'s behalf. *Id*. at 2337. He wrote that, in November 2010, Traci S. sustained a strain of her pelvic ligaments which resulted in pelvic organ prolapse. *Id*. "A pelvic ligament strain is very rarely seen. It is usually caused by female organ prolapsing due to childbirth or severe strain. People who are elderly and overweight are usually candidates for this type of injury." *Id*. He gave his opinion that Traci S.'s work-lifting caused her to develop this strain. *Id*. After her surgery, Traci S. developed "a great deal of panic and anxiety." *Id*. She has had a total of four surgical procedures and will have lifting restrictions for life. *Id*. Dr. Brunetti wrote that he has been Traci's primary care physician for 15 years and "she has never been one to complain . . . unfortunately her restrictions will carry throughout her career." *Id*.

On November 14, 2011, Dr. Heading wrote a letter on Traci S.'s behalf. He wrote that she underwent reconstructive vaginal surgery with pelvic prolapse syndrome. *Id.* at 480. This condition "specifically consisted of grade II cystocele, grade II rectocele, and second degree uterine prolapse." *Id.* She had symptoms for approximately two years, which include constant pelvic pressure, urinary frequency, and severe constipation requiring insertion of a finger into the vagina to push stool from the rectum. *Id.* "These anatomic abnormalities represent a hernia of the female anatomy which is unusual to find in a young woman who has not given birth as in Traci's case." *Id.* Dr. Heading concluded that in his eighteen years of clinical practice he has only seen such a situation once before. *Id.*

On April 17, 2012, Dr. Brunetti wrote a medical source statement in which he noted Traci S.'s uterine and pelvic wall prolapse and rectal prolapse, with spasms and chronic pain. *Id*. at 2037.

On June 21, 2012, Dr. Heading wrote a letter on Traci S.'s behalf. *Id.* at 2038. He explained that she underwent a repeat surgery on May 3 because "she now developed bilateral . . . inguinal (groin) hernia in addition to her previous condition of pelvic prolapse. *Id.* She cannot perform any lifting at this point under any circumstances." *Id.*

On July 16, 2012, Dr. Heading again wrote that "it continues to be my recommendation that she [does] not engage in any lifting activities." *Id.* at 2039.

On July 18, 2012, Traci S. was seen for outlet dysfunction constipation and anal spasm. *Id.* at 2040.

On August 15, 2012, Dr. Heading again wrote that "it continues to be my recommendation that she refrain from all lifting." *Id.* at 2040.

On September 17, 2012, Dr. Heading again wrote "it continues to be my recommendation that she refrain from all lifting." *Id.* at 2041.

On October 22, 2012, Dr. Bellapianta wrote a letter to Dr. Brunetti, in which he noted that after her pelvic surgery, Traci S. has had spasms affecting her adductor muscles and groin that are possibly caused by peripheral neuritis. *Id.* at 2395. She also has severe spasming of her perilumbar spine muscles. *Id.*

On November 14, 2012, Traci S. was noted to be having therapy for spinal muscle spasm. *Id*. at 2445.

On January 9, 2013, Traci S. was noted to be prescribed Zoloft and diazepam. *Id.* at 2480.

On February 6, 2013, Dr. Heading wrote that it continues to be his clinical impression that Traci S. "cannot return to work secondary to [illegible] prolapse recurrence." *Id.* at 2042.

On July 15, 2013, Traci S. was noted to have prolapse and that her vaginal spasms remain. *Id*. at 2483.

On September 3, 2013, Traci S. had a follow-up for Graves' disease. *Id.* at 1356.  Since November, she gained approximately fifteen pounds, associated with profound fatigue, exhaustion, insomnia, and daytime somnolence. *Id.* She cut back on coffee and recently quit smoking. *Id.* She has had occasional palpitations that she thinks may be related to panic attacks, and Zoloft is alleviating some of her symptoms. *Id.* She tried to eat healthy and improved her sleep quality. *Id.* She became positive for diaphoresis, headaches, diarrhea and constipation, and Palpitations. *Id.*

On December 24, 2013, state agency reviewer Dr. Abraham Bernstein gave his opinion that Traci S. has no severe medical impairments. *Id.* at 118.

On December 30, 2013, Traci S. had a consultative examination with Dr. Nancy Kelly, Psy.D. *Id.* at 511. She had a cooperative demeanor, but was occasionally stuttering upon entering the evaluation. Her mood and affect were anxious. *Id.*

At this examination, Traci S.'s recent and remote memory were mildly impaired due to distractibility in the evaluation setting. *Id.* at 513. She recalled 0/3 words after five minutes, but remembered 3/3 immediately. There was no evidence of limitation in following and understanding simple directions or performing simple work tasks independently, maintaining a regular schedule, making appropriate decisions, or relating adequately to others. *Id.* She may have had mild limitations learning new tasks and moderate limitations performing complex tasks independently. *Id.* Traci S. may have had moderate limitations maintaining concentration and

appropriately dealing with stress. *Id.* "The results of the evaluation appear to be consistent with stress-related problems that may significantly interfere with the claimant's ability to function on a daily basis." *Id.*

On January 7, 2014, state agency reviewer Adrian Brown, Ph.D., gave his opinion that Traci S. has moderate difficulty maintaining concentration, persistence, and pace, and mild difficulty maintaining social functioning and performing activities of daily living. *Id.* at 119.

Traci S. was moderately impaired in the ability to carry out detailed instructions and maintain attention and concentration for extended periods *Id.* at 120–121.

On February 18, 2014, Traci S. had her first appointment with Dr. Lynn Morris, who noted diagnoses of Graves' disease, glaucoma, anxiety, and hyperhidrosis of axilla. *Id.* at 2202.

On February 26, 2014, Traci S. was noted to have prolapse and pelvic spasm. She will continue taking Valium. *Id.* at 2469.

On March 27, 2014, the United States Office of Personnel Management issued a noticed that Traci S. is "disabled from [her] position as a Window Clerk due to pelvic prolapse syndrome, cystocele and rectocele." *Id.* at 1754.

On April 17, 2014, state agency reviewer Janine Swanson, Psy.D., gave her opinion that Traci S. has mild difficulty maintaining concentration, persistence, and pace, and difficulty maintaining social functioning and performing activities of daily living. *Id.* at 130.

On May 8, 2014, state agency reviewer Dr. Nisha Singh, MD, gave her opinion that since May 30, 2012, Traci S. has been limited to occasionally lifting twenty pounds, and frequently lifting ten pounds. *Id.* at 131. She can stand and/or walk and sit for six hours in an eight-hour day. *Id.* This was a finding for light exertion. *Id.* at 133.

On May 13, 2014, Traci S. had a cardiac consultation for dyspnea on exertion, palpitations, and a family history of early Coronary Artery Disease. *Id.* at 2196. She has dyspnea on exertion when she walks upstairs and does fast walking. *Id.* Despite stopping smoking, she had slight heaviness in her chest, but only at rest, when lying down. *Id.* She reported increasing fatigue, decreased appetite, and difficulty sleeping. *Id.* Traci S. was "very hypertensive" at her examination, which may be anxiety-driven. *Id.* at 2197.

On May 21, 2014, Traci S. had an abnormal electrocardiogram ("EKG"), showing tricuspid regurgitation. *Id.* at 2195.

On May 21, 2014, after an abnormal EKG, Traci S. had a normal stress test. *Id.* at 870.

On May 28, 2014, Traci S. had a cardiac follow-up for dyspnea on exertion and palpitations. *Id.* at 2190. She had a stress echocardiogram that showed normal left ventricular function and good exercise capacity with no evidence of ischemia. *Id.* She does have some chest pressure and fluttering which can occur after napping. *Id.* Her chest pressure is reproducible to palpation, and she has an occasional heart flutter which is not sustained or symptomatic. *Id.* This normally happens when she breathes out. Traci S. denied unusual fatigue or decreased exercise capacity. She does report increasing fatigue, decreased appetite, and difficulty sleeping. *Id.* Her chest discomfort does not appear to be cardiac in origin and is likely musculoskeletal. *Id.* at 2192.

On May 30, 2014, Traci S. had an abnormal EKG. *Id.* at 2218. A stress test showed ischemia. *Id.* at 2219–2221.

On August 13, 2014, Traci S. had a follow-up for Graves' disease. *Id.* at 1353. She reported palpitations that she thinks may be related to panic attacks. *Id.* Zoloft alleviated some of her symptoms. *Id.* at 1353. Traci S. had weight gain as a result of snacking and decreased

activity, which has been associated with fatigue and poor sleep quality. *Id.* at 1353. She was positive for diaphoresis, palpitations, constipation, diarrhea, and headaches. In addition, Traci S. was nervous and anxious. *Id.* at 1353. Moreover, she was encouraged to increase physical activity to continue losing weight. *Id.* at 1354–1355.

On May 28, 2015, Traci S. had a follow-up for dyspnea on exertion and palpitations. *Id.* at 2187. She has been doing OK and has been lightly exercising including walking her dog and lifting weights. *Id.* Her Zoloft was lowered and she is doing well with that. *Id.* She was anxious on a higher dose. *Id.* She was smoke-free but did have some chest pressure that wasfluttering. She was on disability from the Postal Service for recurrent hernias. *Id.* She reported increasing fatigue, decreased appetite, and difficulty sleeping, but no decrease in her exercise capacity. *Id.* She has a family history of early coronary artery disease. *Id.* Her blood pressure remained in a pre-hypertensive range, but no medications were indicated at this time. *Id.* She was told to eat a low sodium diet, lose a modest amount of weight, and increase exercise. *Id.* at 2188.

On November 25, 2015, Traci S. had a follow up for uterovaginal prolapse. She was advised to continue to avoid very heavy lifting or severe constipation. *Id.* at 2026.

On February 29, 2016, Traci S. had a gynecological follow-up. She was advised to  avoid very heavy lifting or severe constipation due to uterovaginal prolapse, which was intact. *Id.* at 2022.

On March 3, 2016, Dr. Heading wrote a letter on Traci S.'s behalf. *Id.* at 1753. He wrote that she "suffers from pelvic organ prolapse syndrome, rectocele and cystocele . . . . [T]his condition is lifelong and would be significantly worsened by lifting. It is there my medical recommendation that she cannot return to work at any point in the future." *Id.*

On May 27, 2016, Traci S. had a CT scan of her sinuses which showed large nasal septal defect. *Id.* at 848–849.

On August 29, 2016, Traci S. had a follow-up for hernia and uterovaginal prolapse. *Id.* at 2014. She feels something is bulging from her vagina. *Id.* at 2015. She had severe constipation and wants to make sure she is not experiencing a prolapse recurrence. *Id.* Aggravating factors include lifting and standing, and alleviating factors include sleep and rest. *Id.*

On November 9, 2016, Traci S. reported difficulty when reading fine print without glasses. *Id.* at 1847. Both eyes are affected. *Id.*

On December 27, 2016, Traci S. was hospitalized with Graves' disease while off of her thyroid medication, anxiety, and chronic cannabinoid use, with two syncopal episodes. *Id.* at 800. She was in her normal state of health until she suddenly collapsed. *Id.* She then had a second episode, with fifteen convulsions that occurred after she tried to stand up. *Id.* She "is extremely anxious" and eager for information. *Id.* She was told not to drive for three to six months. *Id.* Her syncope may be associated with stress and dyspepsia. *Id.* at 807. A brain MRI identified developmental venous anomaly in the posterior right frontal lobe *Id.* at 820–21. An echocardiogram was normal. *Id.* at 834. During her hospitalization, she had an abnormal electroencephalogram ("EEG"), consistent with mild focal left front temporoparietal dysfunction and possible partial seizure focus. *Id.* at 891. No definite epileptiform activity was seen. *Id.* She was discharged on December 29, with a diagnosis of vasovagal syncope. *Id.*

On January 4, 2017, Traci S. had a follow-up with neurology for a seizure disorder. *Id.* at 2185. She has a history of Graves' disease but is off of thyroid medication. *Id.* She has anxiety, and chronic cannabinoid use. *Id.* She has had two syncopal episodes with no provocative factors identified. *Id.* She is extremely anxious and eager to get as much information as possible. *Id.*

On December 28, 2016, SHS brain MRI showed no abnormal masses but showed a developmental venous anomaly. *Id.*

On December 29, 2016, Traci S. had an abnormal EEG consistent with mild focal left front temporoparietal dysfunction and possible partial seizure focus. *Id.*

On January 16, 2017, Traci S. had a normal myocardial perfusion SPECT study. *Id.* at 962.

On February 1, 2017, Traci S. had a follow up for syncope and collapse. She has no significant arrhythmias. *Id.* at 2179.

On March 7, 2017, Traci S. had a gynecological visit with Dr. Heading. *Id.* at 2008. She has vaginospasm and uterine leiomyoma. *Id.* Although she has not had a repeat uterine prolapse, her uterus is enlarged compared to last year. *Id.*

On May 17, 2017, Traci S. had a follow-up for glaucoma. Her vision is stable, and she experiences no pain. *Id.* at 1837.

On July 10, 2017, Traci S. reported poor sleep quality. *Id.* at 1340–1341. She has difficulty falling asleep and has nonrestorative sleep. *Id.* She reported having quit smoking in March 2013. *Id.* She denied alcohol and drug use. *Id.* She is positive for palpitations, syncope, and headaches. *Id.* She was observed to be nervous and anxious, but not in distress. *Id.* at 1342. She has Graves' disease and is euthyroid without supplementation. *Id.* Her hair loss is likely related to stress. *Id.* at 1343.

On July 24, 2017, Traci S. presented with concerns of difficulty maintaining sleep, and non-refreshing sleep. *Id.* at 1337. She reported being groggy and sluggish when she wakes up in the morning. *Id.* She takes diazepam once a week for muscle spasms. *Id.*

On September 13, 2017, Traci S. presented with complaints of snoring and non-refreshing sleep. *Id.* at 1331. She was assessed with delayed sleep phase syndrome. *Id.* at 1333.

On November 8, 2017, Traci S. reported feeling "a little anxious, irritable, los[t] 6lbs rapidly." *Id.* at 1327.

On November 21, 2017, Traci S. had a complete eye examination. *Id.* at 1833. Since last year she has complained of a mild, gradual decrease in her distance vision. *Id.* It is cloudy and not as clear. *Id.*

On November 29, 2017, Traci S. was noted to have lost nearly twelve pounds in the past several weeks. *Id.* at 1324. She is concerned about the absence of her menses and was advised to follow up with her primary care provider. *Id.* She is positive for anxiety. *Id.*

On July 21, 2020, Dr. George Heading completed a medical source statement. Traci S**.** can occasionally and frequently lift less than ten pounds. *Id.* at 2091. She can stand and/or walk less than two hours in an eight-hour day. *Id.* She must periodically alternate sitting and standing to relieve pain or discomfort. *Id.* at 2094. Her ability to push and/or pull with her lower extremities is limited. *Id.* These limitations exist due to severe pelvic prolapse. *Id.* She should avoid all exposure to all temperature extremes, wetness, humidity, noise, vibration, pulmonary irritants like fumes and odors, and hazards. *Id.*

 On September 2, 2020, state agency reviewer Dr. Alan Fine, MD, gave his opinion that there are no ongoing medically determinable impairments. *Id.* at 87. Also at that time, state agency reviewer Dr. Katrin Carlson, Psy.D., gave her opinion that Traci S.'s mental impairments are non-severe. *Id.* at 88–89.

On October 27, 2020, state agency reviewer, Dr. Marie Turner, MD, affirmed Dr. Fine's opinion. *Id.* at 111–112.

### 2. Disability Application

On October 30, 2013, Traci S. applied for Disability Insurance Benefits under the Social Security Act. *Id.* at 242–243. She argues that she has been disabled within the meaning of the Social Security Act since April 8, 2014, and remains disabled. *Id.* at 79.

On January 9, 2014, Traci S. was denied Disability Insurance Benefits. *Id.* at 113.

On March 4, 2014, Traci S. submitted a Request for Reconsideration. *Id*

On May 8, 2014, Traci S. received a Denial of Reconsideration. *Id.* at 124.

On May 23, 2020, Traci S. submitted a new Application for Disability Insurance Benefits. *Id.* at 214–214.

On September 3, 2020, Traci S. was denied Disability Insurance Benefits. *Id.* at 77.

On September 15, 2020, Traci S. submitted a Request for Reconsideration. *Id.* at 151–152.

On October 27, 2020, Traci S. received a Denial of Reconsideration. *Id.* at 107.

On November 3, 2020, Traci S. submitted a Request for a Hearing. *Id.* at 158–159.

On February 26, 2021, a hearing was held. *Id.* at 40. At the hearing, Traci S. testified that during the period from 2014 until 2017, she had multiple limitations, including lifting restrictions, difficulty standing and sitting for prolonged periods, and psychological challenges, such as anxiety, lack of concentration, and lack of energy. *Id.* at 62–63.

### 3. ALJ Decision

On April 01, 2021, ALJ Harrington issued his decision denying Traci S. disability insurance benefits. *Id.* at 20–32.

At Step One of the sequential evaluation, the ALJ found that Traci S. met the insured status requirements of the Social Security Act on December 31, 2017. At Step Two, the ALJ

found that Traci S. did not engage in substantial gainful activity during the period from her alleged onset date of April 8, 2013 through her date of last insured of December 31, 2017. *Id.* at 23. At Step Three, the ALJ found that Traci S. had the following severe medically determinable impairments: pelvic prolapse syndrome and cystocele/rectocele. *Id.*

At Step Four, the ALJ determined that Traci S. genitourinary disorders do meet the requirements that are medically equaled to severity impairments. *Id.* at 26.

At Step Five, the ALJ determined that, given Traci S.'s treatment history, the objective clinical findings, her subjective complaints, and all of the medical opinions and evidence of record, Traci S. has the capacity to perform light work with the additional limitations including no more than simple, short instructions and simple, work-related decisions with few workplace changes. *Id.* at 27–28.

At Step Six, the ALJ determined that given Traci S.'s age, education, past work experience, and Residual Functional Capacity ("RFC"), she could not perform her previous occupations, including receptionist and post office clerk. *Id.* at 30. ALJ relied upon the testimony of a vocational expert. *Id.*

### B.  Procedural History

On November 29, 2021, Traci S. filed this appeal. *See* Compl.

On March 29, 2022, Traci S. moved to reverse the decision of the Commissioner. *See* Pl. Mem.

On May 25, 2022, the Commissioner moved to affirm the decision. *See* Gov't Mem.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the

record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("[T]he court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'" (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998))).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971))). It is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.    DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled under the Social Security Act, an ALJ must perform a five-step evaluation. As the agency explains:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled . . . ;

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled . . . ;

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . ;

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . ;

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

Traci S. argues that the ALJ erred in his review of medical opinions. Pl. Mem. at 2. In addition, Traci S. argues that the ALJ created a Residential Functional Capacity ("RFC") description based upon of his alleged lackluster review of the medical opinions. *Id.*

The Court will address each of these arguments below.

## A. The Weighing of Medical Opinion Evidence

The regulations regarding the evaluation of medical opinions were amended for claims filed after March 27, 2017, and the "Treating Physician Rule"[2] no longer applies. *See* Revisions

---

[2] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867–68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. Therefore, Traci S.'s application, which was filed in May of 2020, is subject to the new regulations. *See* Tr. at 21 ("The claimant's representative also noted in the post-hearing brief that there was no basis to reopen the prior application [of October 29, 2013]").

Under the new regulations, "the Commissioner 'will not defer or give any specific evidentiary weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources.'" *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021) (quoting 20 C.F.R. § 404.1520c(a)). In considering various medical opinions, the Commissioner will consider factors including "(1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that 'tend to support or contradict a medical opinion or prior administrative medical finding.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(c), 416.920c(c)).

Although the ALJ is no longer required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* (alterations in original) (citation and internal quotation marks omitted).

While the ALJ is not required to specifically discuss each of the factors, the ALJ must expressly consider "the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[S]upportability . . . and consistency . . . are the most important factors . . . [and] [t]herefore, [the ALJ] will explain how [he or she] considered the supportability and

consistency factors for a medical source's medical opinions . . . in your determination."); *see also Vellone ex rel. Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion."), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). "[T]he articulation requirements in [the] final rules" are intended to "allow a . . . reviewing court to trace the path of an adjudicator's reasoning." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017).

For the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). For the consistency analysis, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

Nevertheless, "the regulations still recognize the 'foundational nature' of the observations of treating sources, and consistency with those observations is a factor in determining the value of any [treating source's] opinion." *Jacqueline L.*, 515 F. Supp. 3d at 8 (alteration in original); *see Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 579 (S.D.N.Y. 2022) ("Courts considering the application of the new regulations have concluded that the factors are very similar to the analysis under the old [treating physician] rule." (citations and internal quotation marks omitted)). "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not inconsistent* with

the rest of the record before controlling weight could be assigned." *Jackson*, 588 F. Supp. 3d at 579 (emphasis in original) (citations and internal quotation marks omitted).

Indeed, "despite the new regulations, an ALJ's duty to develop the record takes on heightened importance with respect to a claimant's treating medical sources, because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Id.* at 583 (citations and internal quotation marks omitted). "To satisfy the duty to develop the record, an ALJ should have medical evidence from a medical source with a sufficiently persuasive opinion noting the existence and severity of a disability." *Id.* at 584 (citation and internal quotation marks omitted).

"An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). The Court, however, need not remand the case if the ALJ only committed harmless error such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). But "[w]hen an ALJ's RFC determination is questioned by a claimant, a reviewing court's decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Jackson*, 588 F. Supp. 3d at 584 (citations and internal quotation marks omitted).

Traci S. argues that the ALJ erred in his analysis of her residual functional capacity,[3] as he afforded little to no weight to Traci S.'s long-time treating physicians. *See* Pl. Mem. at 7–11. She also argues that the ALJ failed to appropriately consider the "relevant factors affecting [Traci. S's] ability to perform sitting, standing, and lifting demands found in light, and even sedentary work." Pl. Mem at 11.

The Commissioner argues, in response, that the "ALJ properly found that [Traci S.] had the physical ability to perform a reduced range of light work." Gov't Mem. at 9. In the Commissioner's view, substantial evidence supports the ALJ's assessment of residual functional capacity, even in light of [Traci S.'s] alleged limitations towards "her to lifting no more than five pounds, a sit/stand/walk option, and time off-task." *Id.* at 10. The Commissioner also contends that the ALJ properly found that "[Traci S.'s doctor's] restrictive opinion was only minimally persuasive because it was unsupported by his own treatment notes that showed normal examination findings, recommended that Plaintiff only avoid very heavy or significant lifting, and found no reoccurrence of her pelvic prolapse." *Id.* (internal citations and quotation marks omitted).

The Court agrees.

---

[3] In the context of Social Security determinations, residual functional capacity is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal quotation marks omitted). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)). Residual functional capacity is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a) (2009). An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(2) (2012); *De Leon v. Sec'y of Health & Hum. Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

"The new regulations require an ALJ to specifically explain how well a medical source supports their own opinion(s) and how consistent a medical source/opinion is with the medical evidence as a whole. It is not sufficient to cite to some objective medical evidence in the record and simply conclude that an opinion is consistent with other evidence in the file rendering it persuasive." *Jackson*, 588 F. Supp. 3d at 586 (citation and internal quotation mark omitted).

Here, the ALJ "considered the prior State agency opinions at the initial and reconsideration levels that the claimant could perform light exertional level work . . . . [and found these opinions] persuasive, as they are based on the consistency of their opinions, and that the State agency consultants supported their opinions with detailed explanation of the relevant clinical evidence." Tr. at 29 (internal citations omitted). In doing so, the ALJ gave minimal attention to Dr. Heading's explanation for her medical condition, one supported by medical evidence: that Traci S. "suffers from pelvic organ prolapse syndrome, rectocele and cystocele," that "this condition is lifelong and would be significantly worsened by lifting," and that "she cannot return to work at any point in the future." *Id.* at 1137. This blanket statement, however, failed to address all of the evidence in the record during the relevant period of Traci S.'s claim: from "her alleged onset date of April 8, 2014 through her date last insured of December 31, 2017." *Id.* at 23 (citation omitted). And "Plaintiff's treatment records from Dr. Heading during the relevant period routinely showed normal gynecological examinations with no reoccurrence of pelvic prolapse and documented his recommendation that Plaintiff avoid only heavy lifting." *Id.*

The ALJ also accepted the opinion of a consulting physician, Dr. Nisha Singh. *See id.* at 131 (describing Dr. Singh as the only state agency reviewer who formulated an RFC description). The ALJ found Dr. Singh's recommended limitations "consistent with Dr. Heading's treatment notes from the relevant period . . . [and that in some respects] Dr. Singh's

20

lifting limitations were more restrictive than [what] Dr. Heading recommended in his treatment notes." *Id.* at 8. In addition, the ALJ relied on record evidence that the claimant had a "varied and daily exercise regime and dog-walking business up and through the date last insured expired." *Id.* at 28.

Thus, the ALJ addresses both the issues of consistency and supportability of any medical opinions relied upon because all of the medical records and testimony gathered during the relevant period went to the issue of supportability, and the daily activities reported by Traci S., in conjunction with the medical evidence relied upon by the ALJ, went to the issue of consistency. *Id.* at 28; *see, e.g.*, *Jacqueline L.*, 515 F. Supp. 3d at 10–11 (affirming the ALJ's review of medical opinions because he "explained his findings regarding the supportability and consistency for each of the opinion, pointing to specific evidence in the record supporting those findings").

As for the ALJ's reliance on Dr. Singh's opinion, based on all of the relevant evidence in the record, specifically the medical records and testimony gathered in 2014 by Dr. Singh,  it is both sufficient and appropriate. *See Hilton v. Kijakazi*, 602 F. Supp. 3d 558, 564 (S.D.N.Y. 2022) (noting that ALJs are required to consider "other factors that tend to support or contradict a medical opinion or prior administrative medical finding," which "includes, but is not limited to, evidence showing a medical source has familiarity with other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements" (quoting 20 C.F.R. § 404.1520c(c)(5))). In addition, as a state agency finding, before Dr. Headings' medical opinion in 2020, it is both sufficient and appropriate. *Id.*

The ALJ's decision therefore appropriately assessed the weight to be given to the treating physician's opinions, as required by agency regulations by considering the factors of supportability and consistency. *Cf. Brianne S. v. Comm'r of Soc. Sec.,* No. 19 Civ. 1718 (FPG),

2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide explicit discussion of supportability and consistency of two medical opinions, because ALJ's "mere[ ] state[ment]" that examining physician's opinion was not consistent with overall medical evidence was insufficient).

Accordingly, the ALJ's decision will be affirmed on these grounds.

### B.  Step Four: Residual Functional Capacity

In the context of Social Security determinations, residual functional capacity is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal quotation marks omitted). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)). Residual functional capacity is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a) (2009). An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(2) (2012); *De Leon v. Sec'y of Health & Hum. Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

In light of the Court's discussion of the medical opinions above, the Court will not address Traci S.'s arguments that the ALJ improperly assessed her RFC based upon Traci S.'s physical ability because those issues relate to the ALJ's use of medical opinions and evidence, which the Court has already determined warrant affirmance.

Accordingly, the ALJ's decision will be affirmed on these grounds.

## IV.     CONCLUSION

For the foregoing reasons, Traci S.'s motion to reverse is **DENIED**, and her alternative motion to reverse and remand for a new hearing is **DENIED**.

The Commissioner's motion to affirm is **GRANTED.**

The Clerk of Court respectfully is directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of March, 2023.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge